UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Criminal No. 10-27-P-H |
| | ) | |
| GREGORY PONTOO, | ) | |
| Defendant | ) | |

## RECOMMENDED DECISION ON MOTION TO SUPPRESS

Gregory Pontoo, charged with one count of being a felon in possession of a firearm (a Helwan 9mm semi-automatic pistol) in violation of 18 U.S.C. §§ 922(g)(1) and 924(a), *see* Indictment (Docket No. 1), seeks to suppress evidence gathered as a result of an assertedly illegal stop, search, and arrest in Lewiston, Maine, on August 20, 2009, *see* Motion To Suppress Stop, Search, Arrest ("Motion To Suppress") (Docket No. 11).

An evidentiary hearing was held before me on May 18, 2010, at which the defendant appeared with counsel. The government tendered three witnesses and offered four exhibits, which were admitted by stipulation of the parties. The defendant offered three exhibits, which were admitted by stipulation of the parties. In lieu of oral argument, the parties submitted post-hearing briefs. *See* Defendant's Memorandum of Law in Support of Motion To Suppress ("Defendant's Post-Hearing Brief") (Docket No. 21); Government's Supplemental Brief to Objection to Defendant's Motion to Suppress Stop, Search, and Arrest ("Government's Post-

Hearing Brief") (Docket No. 22). I now recommend that the following findings of fact be adopted and that the Motion To Suppress be denied.

## I. Proposed Findings of Fact

Lewiston, Maine, police officer Tyler Michaud was assigned an overnight shift, known as "morning watch," in Lewiston on August 19-20, 2009. Prior to commencing his shift at 11 p.m., he was told that officers working during the previous shift had been called to 26 Knox Street in Lewiston in response to a report of domestic issues between one Gary Austin, with whom Michaud was then unfamiliar, and Austin's estranged girlfriend, Sherry Boston. Michaud was familiar with 26 Knox Street, which consisted of a series of three identical apartment buildings grouped around a center courtyard. Apartments were accessed from the courtyard and, thus, it was not necessarily possible to tell from which apartment someone had exited to Knox Street. The 26 Knox Street complex is home to many African Americans.

Michaud worked his beat alone; however, he responded to calls outside of his beat, and other officers did the same with respect to calls relating to his beat. Calls from Lewiston dispatchers are broadcast through car and armband radio to all on-duty Lewiston police officers. Underlying 911 calls are not broadcast to officers.

During the course of his shift, Michaud overheard and responded to three calls from Lewiston dispatchers regarding 26 Knox Street. Shortly after Michaud commenced his shift, he and a second officer, Officer Vega,[1] were called to 26 Knox Street in response to a report that Austin was on a fire escape or porch outside Boston's window, ringing a doorbell. They were unable to locate Austin, and left.

---

[1] Officer Vega's first name was not supplied. Nothing turns on the omission.

At about 2:50 a.m., Michaud and Vega returned to 26 Knox Street in response to another call from dispatchers reporting that Boston had again complained that Austin was on her porch, trying to get in and harassing her. Michaud and Vega found Austin, who appeared agitated, on the sidewalk in front of 26 Knox Street and issued him a disorderly conduct warning. They then went on their way.

Approximately 15 minutes later, Michaud and Vega spotted Austin in Kennedy Park, a park several blocks from 26 Knox Street that, by city ordinance, is closed to the public from 1 a.m. to 5 a.m. At 3:05 a.m., Michaud approached Austin and issued him a citation for violating that ordinance. *See* Defendant's Exh. 1. During that encounter, Austin again appeared agitated and disgruntled both with the police and with Boston because she wanted no contact with him. In his citation, Michaud described Austin as a 33-year-old black male, five feet seven inches tall, and weighing 190 pounds. *See id.* During the evidentiary hearing, Michaud did not recall whether, when he encountered Austin in Kennedy Park, he searched him for weapons.

Following that encounter, at 3:21 a.m., Michaud and a second officer, Larry Maillet, responded to an unrelated call on Main Street in Lewiston. Maillet had been apprised upon starting his morning watch shift at 11 p.m. that there had been a domestic disturbance at Knox Street and that he should not be surprised to receive further calls during the night relating to that incident. He had subsequently overheard radio traffic regarding 26 Knox Street. Upon completing the call on Main Street, he asked Michaud to fill him in on what was happening at 26 Knox Street as the two stood outside their parked cruisers. Michaud explained that it was a domestic situation where Austin appeared to be harassing a former girlfriend who wanted no contact with him, and that he had given Austin a criminal trespass warning and sent him on his

way.  Michaud described Austin to Maillet as a black male about six feet tall and weighing 200 pounds.[2]

At about 3:30 a.m., as Michaud and Maillet were engaged in that conversation, they received a call from Lewiston dispatchers reporting that a person had phoned 911 from a pay phone and then hung up, and when dispatchers called the pay-phone number, a man identifying himself as "Tyrone Miller" said that he had killed a woman at 26 Knox Street.  Both Michaud and Maillet assumed, based on the events of the evening, that Miller was in fact Austin.[3]  In Michaud's two-year experience with the Lewiston Police Department, this was a highly unusual call given its potential severity.  While it was possible that it was a crank call, he treated it seriously until its veracity could be disproved.  The supervising officer instructed all units to stop anyone in that area.

Michaud and Maillet both rapidly responded to the call, traveling in separate cruisers to Knox Street, about a minute's drive away.  Michaud arrived first and parked at the intersection of Knox and Spruce streets, intending to walk the approximately 200 feet to 26 Knox Street, which was located near the opposite intersection between Knox and Birch streets.  As he parked, he saw a male start to walk across the street from the area of 26 Knox Street.  By streetlight, the male

---

[2] The defendant argues that it strains credulity to believe that Michaud described Austin to Maillet as six feet tall and weighing 200 pounds – a description conveniently fitting the defendant – when, less than 10 minutes earlier, Michaud had written a citation describing Austin as 5 feet 7 inches tall and weighing 190 pounds.  *See* Defendant's Post-Hearing Brief at [2].  He posits that it is virtually certain that the two officers did not even discuss Austin's physical description, noting that only eight minutes elapsed between the time of the call regarding the Main Street incident and the time of the final call to 26 Knox Street.  *See id.*  I credit the unequivocal testimony of both Michaud and Maillet that Maillet did inquire as to what had been happening at 26 Knox Street and that, as part of his response, Michaud provided a description of Austin.  Michaud testified on direct examination, and Maillet on both direct and cross-examination, that Michaud had described Austin as about six feet tall and weighing 200 pounds.  While Michaud was equivocal on cross-examination, agreeing that he described Austin to Maillet in the same manner as he had just described him in the citation, Maillet, a credible witness, was very clear that Austin was described to him as a black male about six feet tall and weighing 200 pounds.

[3] A compact disc recording of relevant radio traffic that evening reveals that at some point a Lewiston dispatcher broadcast to officers in the field that "Miller" was in fact Austin.  *See* Gov't Exh. 4.  However, it is not clear at what point during the rapidly unfolding events he did so.  In any event, whether in part because of that dispatch or not, Michaud and Maillet both suspected that the caller and possible murderer was Austin.

4

appeared to be of average size and build, about five feet 10 inches or six feet tall. Given the distance and the lighting, Michaud could not see his face or discern his skin color. Michaud thought he was possibly Austin. He radioed dispatchers that he had seen a subject walking out of 26 Knox Street, and that he (Michaud) was starting to walk toward him. Maillet, driving just behind Michaud, heard his radio report and understood him to have said that he had seen "the suspect," which Maillet took as a reference to Austin. Maillet drove around Michaud's cruiser, parked near the suspect in such a manner as he could use his cruiser for cover, exited, drew his gun, and ordered the suspect to put his hands up and turn all the way around. The suspect, who by then was on the sidewalk across the street from 26 Knox Street, complied. Maillet next ordered the suspect down on to his knees and then onto his stomach into the so-called "felony prone" position, on the ground with legs and arms outstretched and head facing away from the officer. The suspect complied. Maillet handcuffed the suspect and conducted a cursory search for weapons. He retrieved a handgun from the suspect's waistband that had not been visible when he had asked him to turn around.

Michaud meanwhile ran toward Maillet and the suspect with gun drawn, reaching them as Maillet was conducting his pat-down search. Maillet stated that the suspect had a gun, which Michaud observed Maillet remove from the suspect's front waistband. Maillet handed the gun to Michaud and finished his pat-down search. Michaud then took over monitoring the suspect while Maillet examined the handgun. At about that time, Michaud observed the suspect's face and saw that he was not Austin. He recognized him as one of three Pontoo brothers who lived in the Lewiston area, although he did not know which one. The suspect was in fact the defendant, Gregory Pontoo. Michaud did not see the defendant's face until after Maillet had taken the gun from his waistband. Maillet was not personally familiar at the time of the stop with either Austin

5

or the defendant. As of the time that the defendant was handcuffed, only minutes had elapsed since officers had received the dispatchers' call, and only seconds had elapsed since Michaud and Maillet had parked on Knox Street.

In the wake of the original broadcast by Lewiston dispatchers of a reported murder and subsequent radio traffic related to it, including the report of the retrieval of a gun from a suspect's waistband, all or nearly all of the Lewiston police department morning watch shift, which usually consists of nine officers, responded, as well as several Androscoggin County deputy sheriffs who had been monitoring Lewiston police broadcasts. In all, four or five officers eventually responded directly to 26 Knox Street. Two officers, including Jeffrey Burkhardt, responded to a pay phone near Vicki's Variety on Birch Street, about three blocks from the 26 Knox Street apartment complex, at approximately 3:29 a.m. They observed a man hanging up a pay phone and picking up another one. *See* Defendant's Exh. 2. Upon questioning, they learned that he was Austin. *See id*. Austin was taken into custody, transported to the Lewiston police station, further questioned, and charged with false report of a crime and misuse of 911. *See id*. He is described in his arrest report as a 33-year-old black male of medium build, five feet eight inches tall, weighing between 160 and 180 pounds. *See* Gov't Exh. 2. Lewiston police officer Derrick St. Laurent later described Austin to a grand jury as fairly well known to the Lewiston police department and known to have mental health issues. St. Laurent stated that the false call to 911 was a relatively common behavior for Austin. St. Laurent knew Austin personally and had dealt with him several times. St. Laurent did not know whether Maillet or Michaud knew Austin and, prior to August 20, 2009, had had no conversations with either officer about Austin.

Following retrieval of the gun from the defendant's waistband, he was taken to the Lewiston police department and booked on a charge of carrying a concealed weapon in violation

of 25 M.R.S.A. § 2001-A(1)(B). *See* Gov't Exh. 1. He is described in his arrest report as a 24-year-old black male of medium build, six feet tall, weighing 185 pounds. *See id*. According to that report, he was arrested at 3:40 a.m. and booked at 5:30 a.m. *See id*.

At some point, Michaud learned from ongoing radio traffic that Austin had been apprehended at Vicki's Variety. As it happened, although unknown to either Maillet or Michaud at the time of the stop of the defendant, no murder had been committed. Michaud did not know, at the time of that stop, that Austin had a history of making false calls to the police department. Michaud did not know, at the time of that stop, that Austin had been arrested or stopped outside of Vicki's Variety. So far as he then knew, Austin was still at large. At the time of his pat-down search of the defendant and retrieval of the handgun, Maillet thought that the individual whom he was searching was Austin and that Austin may have committed a murder.

Maillet worked as a police officer for the City of Los Angeles, California, for 22 years before becoming a Lewiston police officer three-and-half years ago. He has taught tactical training, which consists of locating suspects and apprehending dangerous suspects. Maillet has been trained, when confronting an individual suspected of being involved in a murder, to take that person into custody as safely as possible and detain him or her pending further investigation.

## II. Discussion

The defendant seeks to suppress all evidence seized as a result of his stop, search, and arrest on August 20, 2009, arguing that (i) the police lacked reasonable and articulable suspicion, as required by *Terry v. Ohio*, 392 U.S. 1 (1968), to conduct an investigatory stop of him, (ii) the stop nearly simultaneously morphed into an illegal arrest without probable cause, and (iii) the subsequent search was equally illegal as the byproduct of an unconstitutional stop and arrest. *See* Motion To Suppress at 1.

The government bears the burden of proving the lawfulness of warrantless searches and seizures. *See, e.g., United States v. Ramos-Morales*, 981 F.2d 625, 628 (1st Cir. 1992). For the reasons that follow, I conclude that the government meets that burden with respect to each of the defendant's points.

### A. Defendant's Arguments

#### 1. Initial Stop

The First Circuit has observed:

> In *Terry v. Ohio,* [392 U.S. 1 (1968)], the Supreme Court first recognized that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest. This authority permits officers to stop and briefly detain a person for investigative purposes, and diligently pursue a means of investigation likely to confirm or dispel their suspicions quickly.

*United States v. Trueber,* 238 F.3d 79, 91-92 (1st Cir. 2001) (citations and internal punctuation omitted).

The validity of an investigative *Terry* stop hinges on "whether the officer's actions were justified at their inception, and if so, whether the actions undertaken by the officers following the stop were reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officers during the stop." *Id*. at 92 (citations and internal punctuation omitted). An "objective reasonableness standard" governs. *United States v. Moore*, 235 F.3d 700, 703 (1st Cir. 2000).

"The first part of the [*Terry*] inquiry is satisfied if the officers can point to specific and articulable facts which, taken together with rational inferences derived from those facts, reasonably show that an investigatory stop was warranted." *United States v. Maguire*, 359 F.3d 71, 76 (1st Cir. 2004). "To withstand scrutiny [in the context of a *Terry* stop], an officer must be

able to articulate something more than an inchoate and unparticularized suspicion or hunch." *Id.* (citations and internal quotation marks omitted). "[T]he focus is upon the collective knowledge possessed by, and the aggregate information available to, all the officers involved in the investigation." *United States v. Capelton*, 350 F.3d 231, 240 (1st Cir. 2003) (citation and internal quotation marks omitted) (observing that knowledge of DEA agents who undertook investigation could be imputed to state police who actually effectuated *Terry* stop under "fellow officer rule").

The defendant argues that the stop across from 26 Knox Street was never justified from its inception because he was merely walking on a sidewalk in the vicinity of 26 Knox Street when the police were looking for someone else, and none of his actions suggested the slightest wrongdoing on his part. *See* Defendant's Post-Hearing Brief at [4]. He distinguishes his case from others in which, as a result of multiple factors casting suspicion on a particular individual, the First Circuit deemed a *Terry* stop of that individual justified. *See id.* at [4]-[6]; *see also United States v. Wright*, 582 F.3d 199, 213 (1st Cir. 2009) (*Terry* stop justified on basis of observation that defendant, who was seated in a car parked in manner partially blocking entrance to a mini-mart, appeared to recognize an unmarked police car as a police car, exited his vehicle, ran, clutching his side, and refused to stop when ordered to do so); *United States v. Am*, 564 F.3d 25, 32 (1st Cir. 2009) (*Terry* stop justified on basis of defendant's location in high-crime area, known gang affiliation, criminal history, proclivity to carry weapon, probationary status, and the unusual occurrence of his walking alone in a rival gang's territory); *United States v. Ruidíaz*, 529 F.3d 25, 27, 30-32 (1st Cir. 2008) (*Terry* stop justified when, following 911 call reporting shooting in progress in a notorious high-crime neighborhood, with gunfire having come from

9

green Mercedes Benz, officers observed illegally parked green Mercedes Benz at stated address with man slumped over in front passenger seat who became belligerent when aroused).

### 2. Scope of Stop

The defendant next argues that, by immediately ordering him at gunpoint into a felony-prone position and handcuffing him, the police effectuated his arrest without probable cause, exceeding the bounds of any legitimate *Terry* stop. *See* Defendant's Post-Hearing Brief at [5]-[6]. He contrasts his case with *United States v. Meadows*, 571 F.3d 131 (1st Cir. 2009), in which the handcuffing of a suspect was held not to exceed the reasonable bounds of a *Terry* stop when there was evidence that police harbored an actual fear that the suspect was armed after a fellow officer relayed a warning over the radio based on the discovery of ammunition, but not a gun, in a car from which the suspect had fled from a traffic stop). *See id.* at [6]; *Meadows*, 571 F.3d at 142. In this case, he suggests, police had no reason to suspect that he was armed and dangerous. *See* Defendant's Post-Hearing Brief at [5]-[6].

The defendant argues that, as in *United States v. Lott*, 870 F.2d 778 (1st Cir. 1989), in which a search of a car purportedly for weapons was held unjustified when, *inter alia*, officers were not actually concerned for their safety, Lewiston police officers knew that the 911 call from Austin was a hoax and did not take the reported murder seriously. *See id.* at [5]; *Lott*, 870 F.2d at 783-84 ("Although *Terry* and [*Michigan v.*] *Long*[, 463 U.S. 1032 (1983)] speak in terms of an objective test ('reasonableness') for determining the validity of an officer's frisk for weapons, we do not read those cases as permitting a frisk where, although circumstances might pass an objective test, the officers in the field were not *actually* concerned for their safety.") (emphasis in original).

In addition, citing *Lott*, he posits that officers lacked a factual basis to believe that he (or Austin) was armed and dangerous. *See* Defendant's Post-Hearing Brief at [5]; *Lott*, 870 F.2d at 784-85 (facts that driver had failed to obey two stop signs, driven away from one attempt to stop him, had bleeding wrists, wished to leave and be attended by his own physician, and made statements inconsistent with those of a passenger concerning his wounds, and that the passenger made an attempt to conceal something behind his back that turned out to be a bottle of gin and made a move to return to the car, did not create reasonable, articulable suspicion justifying search of car for weapons).

### 3. Arrest Without Probable Cause

The defendant finally argues that officers lacked not only probable cause to arrest Austin, but probable cause to arrest *him* upon finding the handgun tucked in his waistband. He asserts that, unlike in *Lott*, in which police did not arrest the defendant for possession of a concealed firearm until after they had determined that he did not possess a permit, there is no evidence that any officer ever questioned whether he possessed a permit. *See* Defendant's Post-Hearing Brief at [6].

### B. Government's Arguments

The government rejoins that officers had probable cause to arrest Austin, whom they mistakenly but reasonably believed was the defendant, and to search him incident to that arrest. *See* Government's Objection to Defendant's Motion to Suppress Stop, Search, and Arrest ("Government's Objection") (Docket No. 13) at 3-4; Government's Post-Hearing Brief at 1-3. Nonetheless, it asserts, officers chose to effectuate a *Terry* stop, rather than an arrest, of the man believed to be Austin. *See* Government's Post-Hearing Brief at 3. It contends that officers possessed sufficient reasonable suspicion to effectuate that stop and that, in the circumstances,

involving a potentially serious crime, the intrusive means of the stop, including the handcuffing and pat-down frisk, were justified. *See* Government's Objection at 4-7; Government's Post-Hearing Brief at 3-5. Finally, the government argues, once police seized the handgun from the defendant's waistband, they properly placed him under arrest for carrying a concealed weapon, in violation of 25 M.R.S.A. § 2001-A. *See* Government's Objection at 8; Government's Post-Hearing Brief at 5.

### C. Analysis

#### 1. Initial Stop

The defendant emphasizes that, unlike the suspects in *Wright*, *Am*, and *Ruidíaz*, he was observed to have done absolutely nothing to arouse particularized suspicion prior to being ordered into a felony-prone position in the early morning hours of August 20, 2009. *See* Defendant's Post-Hearing Brief at [4]-[6]. Nonetheless, I agree with the government that, in the totality of the circumstances, officers had sufficient articulable suspicion to conduct a *Terry* stop of Austin and that they reasonably mistook the defendant for Austin.

Both arresting officers, Michaud and Maillet, were apprised upon starting their "morning watch" shift at 11 p.m. that trouble had been brewing at 26 Knox Street, with a call having come in from Boston that Austin, her estranged boyfriend, was harassing her. Both officers were aware, as of the time of the stop of the defendant, that Boston had called twice more, shortly after 11 p.m. and at 2:50 a.m., to report ongoing harassment by Austin. Michaud had personally responded to those calls, and Maillet had overheard radio traffic regarding them and had sought further information from Michaud. Michaud had found Austin to be agitated and disgruntled when he encountered him on the evening in question.

When the call came in from dispatchers at approximately 3:30 a.m. that a "Tyrone Miller" reported having killed a woman at 26 Knox Street, police reasonably believed that the caller was Austin, and were fully justified in launching an immediate search with the object of detaining him and investigating the veracity of that serious and alarming report. The defendant's contention that police did not in fact take this call seriously and knew it to be a hoax, *see* Defendant's Post-Hearing Brief at [5], is not borne out by the evidence. While acknowledging, on cross-examination, that the call *could have been* a hoax, Michaud testified that he took it seriously until proven otherwise. The evidence corroborates that Michaud, Maillet, and the Lewiston police department generally, had reason to take the call seriously and in fact did so:

1. Neither Maillet nor Michaud was familiar with Austin prior to August 19, 2009. Michaud did not know that Austin had any history of making false reports.

2. Both Maillet and Michaud were aware of, and in the case of Michaud, personally participated in, calls regarding Austin's repeated harassment of Boston on the evening in question, with the most recent report made less than an hour before the murder report.

3. Austin was agitated on both occasions when Michaud had personal contact with him.

4. The supervisor on duty sent out a bulletin to all units to stop anyone in the vicinity of 26 Knox Street.

5. Almost all Lewiston police officers on "morning watch" duty, and several county sheriffs, responded either to 26 Knox Street or Vicki's Variety, where the pay phone call was traced.

6. Upon encountering the individual whom Maillet suspected was Austin, he parked in such a manner as to afford cover for himself behind his car.

13

7. Both Michaud and Maillet approached the individual believed to be Austin with guns drawn.

8. While police were called to Vicki's Variety at about the same time that they were called to 26 Knox Street, and Austin was quickly apprehended at a pay phone booth there, neither Michaud nor Maillet was aware while detaining the defendant that Austin was not still at large.

In short, Michaud and Maillet possessed reasonable suspicion to approach and detain Austin – even in the absence of further suspicious conduct on his part – to investigate whether, in fact, he had just committed a very serious crime. The circumstances were, in that respect, materially distinguishable from those present in *Wright*, *Am*, and *Ruidíaz*.

What is more, Maillet reasonably mistook the defendant for Austin. The defendant was the lone individual seen exiting the 26 Knox Street apartment complex and crossing the street at approximately 3:30 a.m., within minutes of the call in which a Tyrone Miller, believed to be Austin, reported that he had murdered a woman at 26 Knox Street. Maillet knew that Michaud had twice personally encountered Austin that evening, and he heard Michaud announce to Lewiston dispatchers that he had seen "the subject," by which Maillet thought that Michaud meant Austin. As Maillet drove his car up close to the defendant, he observed by streetlight that the defendant fit the general description of Austin as a black male approximately six feet tall and weighing 200 pounds. Although the real Austin had been detained roughly simultaneously at a pay phone a few blocks away, neither Maillet nor Michaud, who were focused on the sighting and apprehension of the defendant, was then aware that Austin no longer was at large. The defendant unfortunately, but understandably, was mistaken for Austin. *See Gero v. Henault*, 740 F.2d 78, 81, 84 (1st Cir. 1984) (police reasonably mistakenly arrested the plaintiff pursuant to an

arrest warrant on charges of assault with intent to murder when the victim told police that she had just seen the perpetrator driving a blue pickup truck, and the plaintiff was driving a blue pickup truck and bore a remarkable facial resemblance to the perpetrator); *Jordan v. Fournier*, 324 F. Supp.2d 242, 254-55 (D. Me. 2004) (officers reasonably mistakenly arrested the plaintiff pursuant to an arrest warrant, despite discrepancies between the plaintiff and the warrant subject in age, height, weight, hair, and eye color, when officers were not previously personally familiar with either the plaintiff or the subject, the plaintiff was at the right address and was of the right general age and body type, and the plaintiff submitted to arrest with no more than a request for an explanation).

**B. Scope of Stop**

The defendant next challenges the manner in which the stop was effectuated, which he posits exceeded the bounds of a permissible *Terry* stop, simultaneously converting the "stop" into a *de facto* arrest. *See* Defendant's Post-Hearing Brief at [6].

As the defendant acknowledges, *see id.*, the use of means such as drawn weapons and handcuffs to effectuate a *Terry* stop do not necessarily convert it into an arrest, *see, e.g., Maguire,* 359 F.3d at 78 ("Dorrance's use of his weapon when he encountered Maguire was permissible during an investigatory stop. It is well established that the use or display of a weapon does not alone turn an investigatory stop into a de facto arrest."); *United States v. Navarrete-Barron*, 192 F.3d 786, 791 (8th Cir. 1999) (in light of dangerous nature of suspected crime of drug trafficking and good possibility driver or passenger had weapon, limits of *Terry* stop were not exceeded when suspect was handcuffed while officers searched truck; "Several other circuits also have found that using handcuffs can be a reasonable precaution during a *Terry* stop."); *Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1030 (10th Cir. 1997) ("[A] *Terry*

15

stop does not automatically elevate into an arrest where police officers use handcuffs on a suspect or place him on the ground. Police officers are authorized to take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the course of a *Terry* stop.") (citations and internal punctuation omitted); *United States v. Le*, 377 F. Supp.2d 245, 254 (D. Me. 2005), *aff'd*, 471 F.3d 1 (1st Cir. 2006) ("Of course, officers may take necessary steps to protect themselves if the circumstances reasonably warrant such measures without transforming a *Terry* stop into an arrest. This includes drawing weapons when reasonable, such as when officers are faced with a report of an armed threat. The First Circuit has also allowed the reasonable use of handcuffs and backup officers as the situation requires.") (citations and internal quotation marks omitted).

The law with respect to the undertaking of a pat-frisk for weapons in the course of a *Terry* stop is similar. *See, e.g., Lott*, 870 F.2d at 783 ("The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.") (citation and internal quotation marks omitted).

While, in this case, there was no report that Austin was armed, the record bears out that Maillet and Michaud did actually fear for their safety, and that their fear was objectively reasonable. That Maillet and Michaud subjectively feared for their safety is evident from their actions: both Maillet and Michaud drew their weapons, Maillet parked his cruiser in such a manner as to afford himself cover, and Maillet immediately ordered the defendant into a felony-

prone position, handcuffed, and pat-frisked him. That fear, in turn, was objectively reasonable in the circumstances: the individual whom they sought had harassed his ex-girlfriend throughout the night, previously appeared agitated, and now reported at 3:30 in the morning that he had committed murder at the location of her address. Officers were permitted to draw a reasonable inference that he might be carrying a deadly weapon and to take the precautions actually taken. *See, e.g., United States v. Bullock*, 510 F.3d 342, 346 (D.C. Cir. 2007) ("If an officer possesses reasonable suspicion that the detained suspect committed a violent or serious crime – such as murder, robbery, rape, burglary, assault with a weapon, or various drug offenses – the officer by definition is dealing with an individual reasonably suspected of committing a crime that involves or is associated with carrying or using a weapon. In such cases, it logically and necessarily follows that the officer may reasonably conclude the suspect may be armed and presently dangerous.") (citation and internal quotation marks omitted); *United States v. Stewart*, 388 F.3d 1079, 1085 (7th Cir. 2004) (it was not unreasonable, during *Terry* stop, for officers to handcuff an individual whom they suspected had perpetrated a violent crime and was armed); *United States v. Tilmon*, 19 F.3d 1221, 1228 (7th Cir. 1994) ("When a suspect is considered dangerous, requiring him to lie face down on the ground is the safest way for police officers to approach him, handcuff him and finally determine whether he carries any weapons. Thus, a 'lying prone' requirement may be within the scope of an investigative detention. Relying only on the guns trained upon a suspect may not, in certain circumstances, ensure the officers' safety or the safety of innocent bystanders.") (citations omitted).

Consistent with the nature of a *Terry* stop, the initial investigatory stop was of brief duration: only seconds elapsed from the moment when Maillet ordered the defendant to the ground to the time he found the weapon hidden in his waistband and Michaud recognized that

17

the defendant was not Austin. By then, as discussed below, officers had developed probable cause to arrest the defendant.

## C. Probable Cause To Arrest

The defendant finally argues that officers lacked probable cause to arrest him on a charge of carrying a concealed weapon, in violation of 25 M.R.S.A. § 2001-A, there being no evidence that they inquired whether he possessed a permit to carry such a weapon. *See* Defendant's Post-Hearing Brief at [6].

The statute in question prohibits a person from "wear[ing] under the person's clothes or conceal[ing] about the person's person a firearm, slungshot, knuckles, bowie knife, dirk, stiletto or other dangerous or deadly weapon usually employed in the attack on or defense of a person." 25 M.R.S.A. § 2001-A(1)(B). There are several exceptions, including the carrying of a firearm "by a person to whom a valid permit to carry a concealed firearm has been issued[.]" *Id.* § 2001-A(2)(A). Violation of section 2001-A is a Class D crime. *See id.* § 2004(2).

As the First Circuit has clarified:

> Probable cause exists when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime. The inquiry into probable cause focuses on what the officer knew at the time of the arrest, and should evaluate the totality of the circumstances. Probable cause is a common sense, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

*United States v. Vongkaysone*, 434 F.3d 68, 73-74 (1st Cir. 2006) (citations and internal punctuation omitted). An officer's determination that a crime has been committed need not be "ironclad" or even "highly probable"; it need only have been "reasonable" to satisfy the standard of probable cause. *United States v. Winchenbach*, 197 F.3d 548, 555-56 (1st Cir. 1999); *see also, e.g., Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 255 (1st Cir. 1996) ("[O]ne

who asserts the existence of probable cause is not a guarantor either of the accuracy of the information upon which he has reasonably relied or of the ultimate conclusion that he reasonably drew therefrom.").

While there is no evidence that officers inquired whether the defendant had a permit, there is no evidence that he had one, claimed that he had one, or showed one to the officers. Probable cause does not equate to ironclad proof. Upon finding the weapon concealed in the defendant's waistband, officers had probable cause to believe that he had committed the crime with which he was charged.

### III. Conclusion

For the foregoing reasons, I recommend that the Motion To Suppress be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within fourteen (14) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 14th day of June, 2010.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge